**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL CASE NO.** |
| **v.** | **1:16-CR-00127-AT-LTW** |
| **ABIOLA BALOGUN,** | |
| Defendant. | |

**MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION
AND ORDER CERTIFYING THIS CASE READY FOR TRIAL**

Pending before this Court is Defendant Abiola Balogun's Preliminary Motion to Dismiss for Pre-Indictment Delay and Perfected Motion to Dismiss for Pre-Indictment Delay. (Docs. 15, 23, 43). Defendant has also filed a Motion to Dismiss the Indictment alleging the indictment fails to satisfy the indictment requirement of the Fifth Amendment to the United States Constitution. (Doc. 51). Alternatively, Defendant asks the Court to inspect, *in camera*, the transcript of the grand jury proceedings to determine whether the grand jury was informed it must find probable cause for the offense element that she made false statements that were material to her procurement of naturalization. (Doc. 51). The Government has filed responses in opposition to Defendant's motions. (Doc. 26, 46, 55). Having considered the parties' arguments, briefs, and all supporting documents submitted, and for the reasons set forth below, this

Court **RECOMMENDS** that Defendant's Motions to Dismiss the Indictment for Pre-Indictment Delay and Motion to Dismiss the Indictment on Fifth Amendment grounds be **DENIED**. (Docs. 15, 23, 43, 51). Because there are no more motions or other matters pending in this case, the undersigned hereby certifies this case ready for trial.

**DEFENDANT'S MOTIONS TO DISMISS FOR
PRE-INDICTMENT DELAY**

**1.    Procedural Background**

On April 12, 2016, a grand jury in the Northern District of Georgia returned an indictment against Defendant Abiola Balogun charging her with conduct that occurred on or about August 23, 2006. (Doc. 1). Defendant is charged with knowingly procuring, contrary to law, naturalization by the United States and United States citizenship, in violation of Title 18 U.S.C. 1425(a). The indictment also charged Defendant in count two of the indictment with knowingly making false statements under oath in a case, proceeding and matter relating to naturalization and itizenship in violation of 18 U.S.C. § 1015(a); and in count three with knowingly using a United States certificate of naturalization to obtain a United States passport knowing that the United States certificate of naturalization had been procured by fraud and false evidence and otherwise had been unlawfully obtained in violation of 18 U.S.C. § 1015(c). On June 24, 2016, the Government filed a motion to dismiss counts two and three of the indictment. (Doc. 18). The motion was subsequently granted by the Court on July 7, 2017. (Doc. 20).

## 2.   Factual Background

### A.   An Alert is Placed with Customs and Border Protection

On October 27, 2015, an alert or lookout for Abiola Balogun was entered in the Customs and Border Protection's ("CBP") computer system at ports of entry indicating that she was utilizing two different identities.  (Tr. of May 14, 2017 Hrg. ("Tr.") 15, 24). The record also indicated that the two identities were linked through a fingerprint comparison in the U.S. Visit computer system.  (Tr. 15).  The two identities linked by fingerprint analysis were in the names of Sarah Balogun, who filed for asylum in 1991, was denied in 1993, and ordered removed, and Defendant Abiola Balogun, who filed for asylum in 1993 and was ultimately naturalized in 2006.[1]  (Tr. 18-20).  On December 9, 2015, Defendant Abiola Balogun ("Defendant") was encountered by CBP at the International Airport in Houston, Texas when she arrived on a flight from Africa.  (Tr. 26).  In light of the lookout placed on her record, CPB sent Defendant to a secondary area for additional examination.  (Tr. 26).  While in secondary, CBP attempted to take a statement from Defendant (presumably to ascertain information about the two different identities), but she declined.  (Tr. 15).  Defendant and the information regarding the linking of her two identities was sent to the Northern District of Georgia, the jurisdiction that was determined to have authority over her because that was where she resided and

---

[1]  Defendant Abiola Balogun obtained lawful permanent resident status sometime around 1997 or 1998, and in 2006, she was granted citizenship by naturalization.  (Tr. 20-21).

where her N-400 application was filed and adjudicated.  (Tr. 15, 25).

On December 28, 2015, Homeland Security Investigations ("HSI") Special Agent Kevin Heirlein ("Agent Heirlein") and a co-case agent were assigned Defendant's case. (Tr. 12-14).  Part of Agent Heirlein's duties include investigating potential allegations of naturalization fraud in violation of 18 U.S.C. § 1425.  (Tr. 13).  After Defendant's case was assigned, the agents ordered two separate original alien files (A-file) for Defendant Abiola Balogun and Sarah Balogun.  (Tr. 17, 33).  An A-file contains an individual's paperwork, applications, and any interaction they may have had with immigration services. (Tr. 17). On receiving A-files for both Sarah Balogun and Abiola Balogun on January 21, 2016, the agents reviewed the A-files to get a general idea if the individuals in both files were one in the same; they concluded that it appeared that the individuals in both A-files were the same person; and subsequently presented the case to the United States Attorney's Office ("USAO") for prosecution.  (Tr. 17).  Once the case was accepted for prosecution, HSI officially opened a case file on February 17, 2016, and proceeded to take additional investigative steps.  (Tr. 17).  On March 10, 2016, using HSI's computer system, the agents conducted a fingerprint comparison of the fingerprints contained in both A-files.  (Tr. 18).  Agent Heirlein scanned into HSI's computerized system every set of fingerprints in both A-files from the filing of the initial asylum application by Sarah Balogun in 1991 to the fingerprints obtained from Defendant Abiola Balogun at the time of her arrest in Houston, Texas on December 27, 2015, and all the prints were compared and matched.  (Tr. 26-27, 29).  On further review

4

of databases available to him, Agent Heirlein discovered that on January 19, 2010, an alert had been places by Immigration Customs and Enforcement ("ICE") Fugitive Operations was placed in immigration records solely for Sarah Balogun listing her as either a fugitive or a self-deport.[2]  (Tr. 18, 22-23).  At that time, there appeared to be no link between the identity of Sarah Balogun and Defendant Abiola Balogun.  (Tr. 19).

**B.    Immigration's Centralized Electronic Storage and Fingerprint System**

Historically, immigration agencies did not place every fingerprint into a centralized system as soon as they obtained them.  (Tr. 16).  Instead, Agent Heirlein testified that in the 1990s everything was done manually.  (Id.).  The fingerprints were inked (on fingerprint cards), attached to different immigration applications, and then filed with Immigration and Naturalization Services.[3]  (Tr. 16, 20, 32).  On cross examination, Agent Heirlein testified that at the time Defendant obtained her lawful permanent resident status in 1997 or 1998, immigration agencies would have run a

---

[2] Agent Heirlein explained that a fugitive from a deportation is an individual who is ordered deported by an immigration judge or has some form of deportation order or removal order that has not been executed, in other words, an outstanding warrant of deportation.  (Tr. 19).  Agent Heirlein also explained that a self-deport is an individual under a warrant of deportation that is left on their own or allowed to deport themselves.  (Tr. 31).  The warrant for deportation was issued in the 1990s, and may have been issued in January of 1994.  (Tr. 23).

[3] Immigration and Naturalization Services ("INS") ceased to exist under that name on March 1, 2003, when most of its functions were transferred to three new entities - U.S. Citizenship and Immigration Services (USCIS), U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP) - within the newly created Department of Homeland Security Investigations, as part of a major government reorganization.  See U.S. Immigration and Customs Enforcement, https://www.ice.gov/hsi (last visited Dec. 27, 2017).

5

criminal history check both by name and by fingerprints. (Tr. 20). The fingerprint comparison would have been performed "more or less" manually based upon ink fingerprint (cards) that were sent to the Federal Bureau of Investigations ("FBI") to determine whether the individual had a criminal history. (Tr. 20, 32). Agent Heirlein also testified if someone had an alternative identity and if the fingerprints were not linked to the alternative identity in the FBI's system, the individual would not be flagged. (Tr. 20). Conversely, by the late 1990s or early 2000s, immigration agencies began getting away from fingerprint cards, and began transitioning to electronic storage of biometrics and comparison of fingerprints. (Tr. 21, 32). Agent Heirlein explained that if an immigration application is filed now, biometrics are taken electronically (instead of using inked fingerprint cards) and stored in HSI's computerized system. (Tr. 21). If another application is filed by the same applicant under another name, those electronic fingerprints would then link and indicate that the applicant has filed another application under another name. (Tr. 22).

When asked on cross examination was there any type of identity checks from a fingerprint standpoint being performed when Defendant Abiola Balogun was granted citizenship in 2006, Agent Heirlein responded that her fingerprints would have been entered into the system at that time. (Tr. 21-22). To compare whether or not Defendant had another identity associated with her (by name and/or fingerprints) would depend on what information was already contained in the system because immigration agencies have not yet completed putting historical records from older alien files into the

6

(electronic) system.  (Tr. 22).  Agent Heirlein further explained that he has a number of cases in similar situations where the fingerprints were uploaded much later (than the applications), and then a correlation between (the identities) of two individuals is made years after they have been naturalized. (Id. ).

Agent Heirlein testified that he did not know exactly when the fingerprints for Sarah Balogun were uploaded into the system.  Agent Heirlein believes that the fingerprints may have been uploaded around October 27, 2015, because a lookout was placed with Customs and Border Protection at that time, noting that Balogun had two identities.  (Id. ).

Agent Heirlein appeared to reject the notion that Defendant's allged alternative identity would have been discovered at the time of the 2010 ICE alert.  Agent Heirlein clarified that the January 19, 2010 alert or lookout for Sarah Balogun was placed by the deportation section of ICE Fugitive Operations and that Customs and Border Protection would have to know to look for it.  (Tr. 23).  Specifically, if Sarah Balogun was encountered by Customs at a port of entry, they would not have seen the alert or lookout unless they entered her name and exact date of birth.  (Tr. 18, 23).

Agent Heirlein testified that around the time the alert was placed for Sarah Balogun in 2010, there were certain operations in place where all records were being placed in HSI's electronic storage system.  (Tr. 23).  One such operation was Targeting Groups of Inadmissible Subjects ("TGIS").  In connection with the TGIS operation, fugitive operations for ICE actively placed all outstanding lookouts and warrants into

the (electronic) system targeting individuals that had biometric matches or two separate identities and matching fingerprints. (Tr. 32). Pursuant to TGIS, if a subject was encountered, individuals would know this person was a fugitive from a deportation warrant. (Tr. 23-24, 34). Agent Heirlein believes that the 2010 alert for Sarah Balogun also may have resulted from TGIS' input of all records into HSI's electronic storage system in order to identify fugitives from deportation warrants. (Tr. 24).

Agent Heirlein also testified that the October 27, 2015 alert or lookout for Defendant Abiola Balogun was placed with Customs and Border Protection and indicated that she may have two A-files. (Id.). Agent Heirlein noted that record stated that a match of two sets of fingerprints was made in HSI's U.S. Vist computer system. (Tr. 24-25). Based on his knowledge of CBP, Agent Heirlein further testified that when Defendant Abiola Balogun was encountered on December 8, 2015 coming back into the country, she would have been required to go to inspections where a set of fingerprints were taken at the time of entry. (Tr. 26-27). Agent Heirlein believes that the October 27, 2015 alert was likely generated when fingerprints from Sarah Balogun's A-file were uploaded into the computer system and they matched fingerprints contained in Defendant Abiola Balogun's N-400 naturalization application filed in the 2000s. (Tr. 25-27). Agent Heirlein confirmed that there was an automated comparison done between the prints of Defendant Abiola Balogun and Sarah Balogun and that they were a biometric match in the U.S. Visit system. (Tr. 29). Based on his comparisons and scanning of the fingerprints from the A-files for Sarah Balogun and Defendant, Agent

8

Heirlein testified that he received the same fingerprint matches that the U.S. Visit system received. (Tr. 29). Agent Heirlein also testified that the first confirmation that Sarah Balogun and Defendant Abiola Balogun were the same individual was in 2015. (Tr. 30). After confirming that Sarah Balogun and Defendant Abiola Balogun fingerprints matched, the case was presented to the grand jury on April 12, 2016. (Tr. 18).

## LEGAL ANALYSIS

Defendant argues the indictment against her should be dismissed because the more than nine-year delay between the alleged offense in August 2006 and the return of an indictment against her by the grand jury on April 12, 2016, substantially prejudiced her ability to prepare and present her defense at trial. Defendant also contends that due to the lengthy delay, she has been greatly hindered in her ability to present testimony from witnesses in her defense. Lastly, Defendant posits that the Government was willfully blind to its claimed basis for prosecuting her. In support, Defendant points simply to the delay that occurred between the alleged offense in 2006 when she became a naturalized citizen and 2015 when her fingerprints were compared against others in the immigration database. In response, the Government argues Defendant failed to carry her burden of showing that she suffered actual prejudice or that the Government deliberately delayed the indictment to gain a tactical advantage.

"The limit on pre-indictment delay is usually set by the statute of limitations." United States v. Foxman, 87 F.3d 1220, 1222 (11th Cir. 1996). In this case, Defendant Abiola Balogun was indicted under 18 U.S.C. § 1425(a), which has a ten year statute of

limitations.  See 18 U.S.C. § 3291.  Because the indictment was filed within the statute of limitations, Defendant Abiola Balogun does not argue the indictment violates the applicable statute of limitations.  Even if the indictment is brought within the limitations period, however, the Fifth Amendment's Due Process Clause can bar an indictment. United States v. Witchard, 646 F. App'x 793, 795 (11th Cir. 2016) (citing United States v. Marion, 404 U.S. 307, 323-27 (1871) and United States v. Lovasco, 431 U.S. 783, 788-91 (1977)).  A defendant must show "that pre-indictment delay caused him actual substantial prejudice and that the delay was the product of a deliberate act by the government designed to gain a tactical advantage." Foxman, 87 F.3d at 1222; see also Witchard, 646 F. App'x at 795; United States v. Jones, 592 F. App'x 920, 921 (11th Cir. 2015) (per curiam).  Thus, "[b]ecause [Defendant Abiola Balogun] does not argue that the applicable statute [] of limitations barred [her] prosecution, [s]he shoulders the burden of show[ing] that pre-indictment delay was deliberate for the purpose of tactical advantage." United States v. Ramirez, 491 F. App'x 65, 70 (11th Cir. 2012).  "[T]hat burden has been characterized as a 'heavy' one." United States v. Stoll, No. 10-60194-CR, 2011 WL 939251, at *7 (S.D. Fla. Feb.16, 2011), adopted by 2011 WL 765949, at *1 (S.D. Fla. Feb. 25, 2011).  "Indeed, so 'rare' are dismissals for pre-indictment delay that [the Eleventh Circuit] once remarked that it had 'never concluded that such a dismissal was appropriate.'" Id. (quoting Foxman, 87 F.3d at 1224 n.4.

Defendant Abiola Balogun "must demonstrate actual prejudice and not merely the real possibility of prejudice inherent in any extended delay." United States v. Heard,

10

No. 1:12-cr-40 (WLS), 2013 WL 1966299, at *3 (M.D. Ga. May 10, 2013). "Prejudice is demonstrated when the defendant has been 'meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected.'" United States v. McKoy, 129 F. App'x. 815, 819 (11th Cir. 2005) (quoting Jones v. Angelone, 94 F.3d 900, 907 (4th Cir. 1996)). "For the defendant to carry the heavy burden of proving actual prejudice from pre-indictment delay, concrete proof is required; mere speculation and bare allegations will not suffice." United States v. McCoy, 977 F.2d 706, 711 (11th Cir. 1992).

In the instant action, Defendant failed to carry her burden of proving actual prejudice from the pre-indictment delay. At best, Defendant presents, via argument and bare allegations, the mere possibility that the pre-indictment delay has prejudiced her defense. At worst, Defendant merely speculates that her defense has been prejudiced or otherwise impaired by the lengthy pre-indictment delay.

Specifically, Defendant argues that, as a result of the pre-indictment delay, she has lost the ability to present two important witnesses who are now deceased, with one having died in 2007 and the other in 2009. Defendant alleges that the two witnesses would have testified that they only knew her by one name from the time she came to the United States. Defendant further alleges that the two deceased witnesses would have been able to view the photograph submitted in conjunction with Sarah Balogun's asylum application and testify that the photograph does not depict her.

The undersigned finds that Defendant's allegations fall short of proving actual

11

prejudice from the Government's pre-indictment delay. First, Defendant does not argue nor does she present any concrete proof showing that she has been actually prejudiced by the pre-indictment delay. Other than Defendant's arguments that her deceased witnesses only knew her by one name and could view photographs of Sarah Balogun and testify that they do not depict her, "[n]o other evidence exists to corroborate this contention," United States v. Jones, No. 4:12-CR-6 (CDL), 2013 WL 6794978, at *2 (M.D. Ga. Dec. 19, 2013), and "[c]oncrete proof is required for [Defendant Abiola Balogun] to carry [her] heavy burden," United States v. Campbell, No. 1:04-CR-0424-RWS, 2005 WL 6436621, at *16 (N.D. Ga. Oct. 24, 2005).

Second, Plaintiff provides only bare allegations and speculation as to the testimony of the two purportedly deceased witnesses. Based on the arguments presented by Defendant, the significance of the testimony from the two deceased witnesses appears to be de minimis at best. Even if the two deceased witnesses only knew Defendant Abiola Balogun by one name as Defendant alleges, there is no evidence in the record indicating that these witnesses would have (1) agreed to testify on Defendant's behalf, (2) testified to knowing Defendant by one name, and (3) reviewed photographs to determine whether or not Defendant was depicted in the photographs. Instead, Defense counsel simply alleges Defendant knew the deceased witnesses when she lived in New York before she relocated to Atlanta, Georgia in 2006 or 2007. (Tr. 9). Defense counsel alleges, without support, that his client lost contact with both witnesses even before the offense at issue in this case was committed in 2006. According to Defense counsel,

12

Defendant allegedly lost contact with one of the deceased witnesses in the 1990s and appears to have lost contact with the other witness sometime in 2005. (Tr. 8-9). It is, however, difficult for the undersigned to understand how two deceased witnesses who Defendant allegedly knew when she lived in New York, at some time prior to 2005, would have any knowledge of any responses allegedly provided and/or documents submitted by Defendant Abiola Balogun in support of her efforts to become a naturalized citizen. There has been no showing that these two purported witnesses would be willing to or could offer any testimony regarding whether Defendant Abiola Balogun provided false statement(s) in 2006 in sworn responses to immigration application documents as alleged by the Government.

Additionally, the Court is not persuaded that Defendant has shown actual prejudice due to pre-indictment delay by speculating that the two deceased witnesses would have been able to view photographs submitted in conjunction with Sarah Balogun's asylum application and testify that the photograph does not depict her. This Court is also not persuaded by Defendant's allegation that due to the passage of time, she is also unable to locate any other witnesses who could also testify that the photograph of Sarah Balogun is not Defendant Abiola Balogun. (Tr. 9). The undersigned notes that during the evidentiary hearing, Defense counsel stated that Plaintiff has lived in Atlanta for at least ten years. (Tr. 9). Notably, Defendant did not contend that she is unable to find either a family member or anyone else in the metro-Atlanta area who can look at a photograph and testify whether or the person depicted is

13

Defendant Abiola Balogun.

Furthermore, because the crux of the Government's case appears to rest on forensic evidence, and not on a lengthy investigation, it appears that any prejudice Defendant alleges she may allegedly experience because her witnesses are deceased can be remedied by calling an expert witness.  The undersigned observes that Defendant does not argue she is unable to retain the services of a forensic expert to review the contents of both A-files to (1) respond to and refute the Government's allegations that the fingerprints from Sarah Balogun's file were a match with Abiola Balogun's fingerprints, (2) show that the photographs of Sarah Balogun do not depict Abiola Balogun; and (3) if necessary, demonstrate that the handwriting provided on immigration documents in both files were not provided by the same person.  Thus, the Court finds the Defendant's arguments of prejudice based on pre-indictment delay resulting from the alleged loss of testimonial evidence from two deceased witnesses to be woefully insufficient to show actual prejudice.  Again, to prove prejudice from the loss of deceased witnesses' testimony, "a defendant must make more than a general allegation of loss of witnesses." United States v. Williams, Nos. 1:11-CR-547-ODE-ECS, 1:12-CR-80-ODE-ECS, 2012 WL 5845004, at *2 (N.D. Ga. Nov. 16, 2012); see also Heard, 2013 WL 1966299, at *3 ("[S]peculative allegations, such as general allegation of loss of witnesses and failure of memories, are insufficient to demonstrate. . . actual prejudice[.]").  Here, Defendant can only argue what she believes the deceased witnesses' testimony would have been despite having admittedly lost contact with them

14

years before they died and that is simply not enough.

Finally, although the Court agrees that nine plus years is a lengthy period of time, the pre-indictment delay standard requires Defendant to produce evidence that shows the specifics of actual prejudice. It is a heavy burden and must be more than the generalized prejudice that plagues every defendant who is not indicted within a year of the last criminal act. Foxman, 87 F.3d at 1222 (evidence introduced showing the number of key witnesses who had died in the 10-year period in a predominately testimonial evidence conspiracy case, and defendant's lack of incentive to preserve evidence); United States v. Benson, 846 F.2d 1338, 1341-42 (11th Cir. 1988) (dismissal denied although evidence of eight-year delay, loss of two specific alibi witnesses, loss of passport, death of case agent who interviewed and believed defendant, and destruction of evidence of his cooperation, etc.). Without such evidence the Court does not have a factual basis to find the required actual prejudice to trigger a constitutional violation. Thus, Defendant has not met the prejudice prong of her burden.

Furthermore, even if Defendant had been able to show actual, substantial prejudice stemming from the Government's pre-indictment delay, she is unable to meet the additional burden of showing that the Government delayed the indictment deliberately in order to gain a tactical advantage. In this case, there is no evidence that the Government has been willfully blind to the basis for prosecution against Defendant as she argues. To the contrary, the testimonial evidence established that the delay in the filing of the indictment against Defendant resulted from, among other administrative

things, a fragmented and antiquated immigration filing system.  The evidence revealed that Defendant was arrested after immigration agencies uploaded antiquated ink fingerprint cards into a centralized computer database or electronic storage system and began a lengthy transition from fingerprint cards to using biometrics to compare fingerprints from fingerprint cards to fingerprints of individuals who were under warrants or deportation orders.  (Tr. 16, 20-24, 29, 31-32).

As Agent Heirlein testified, in 2010, there were certain operations in place such as TGIS, that targeted inadmissible aliens with biometric matches or two separate identities and matching fingerprints.  (Tr. 31-32).  This involved placing all outstanding immigration lookouts and warrants into a computerized system so that if a subject was encountered by an immigration officer, the officer would know that this person is a fugitive from a deportation warrant.  (Tr. 23-24, 34).  Agent Heirlein further explained that immigration has been putting historical records into the biometric system from older A-files for years, and to date, they may have not yet completed that task.  (Tr. 22).  As a result of A-files being imputed into the biometric system much later, it is likely that, as in this case, a correlation was made between individuals within the biometric system years after they were naturalized.  (Tr. 22). Agent Heirlein noted that on January 19, 2010, ICE placed a lookout for Sarah Balogun listing her as either a fugitive or a self-deport.  (Tr. 18, 22-23).  Thereafter, on October 27, 2015, an alert was placed on Defendant Abiola Balogun's record due to fingerprint analysis linking her fingerprints to two identities.  (Tr. 15).  The fingerprint biometric analysis linked fingerprints in the

16

A-file of Sarah Balogun (who filed for asylum in 1991 but was denied and ordered removed), to fingerprints within the A-file Defendant Abiola Balogun (who filed for asylum in 1993 and was naturalized in 2006); specifically, the N-400 naturalization application contained in her A-file.  (Tr. 15, 18-19, 24-25, 29).

Shortly after the October 27, 2015 alert was placed on Plaintiff's record, she was encountered on December 8, 2015, in Houston, Texas after arriving on an international flight from Africa.  (Tr. 15, 18-20, 25-26, 29).   Because Defendant resided and completed the N-400 naturalization application in the Northern District of Georgia, the investigation was referred to this district.  (Tr. 14-15).  On December 28, 2015, Defendant's case was assigned to Agent Heirlein and another agent. (Tr. 12-14).  As a part of his investigation, the agents ordered two A-files, the original A-file for Defendant Abiola Balogun and one for Sarah Balogun.  (Tr. 16-17).  On January 21, 2016, the agents received and reviewed both A-files to get a general idea if the individuals in both files were one in the same, and concluded that they were the same person before presenting the case to the USAO for prosecution. (Tr. 17).  Once the case was accepted for prosecution, HSI opened officially opened a case file on February 17, 2016, and proceeded to take additional investigative steps.  (Tr.  17).  On March 10, 2016, the agents conducted a fingerprint comparison of the fingerprints contained in both A-files using HSI's computer system.  (Tr. 18).  The agents scanned into HSI's computerized system every set of fingerprints in both A-files from the time of the filing of the initial asylum application by Sarah Balogun in 1991 to the prints obtained from

17

Defendant Abiola Balogun at the time of her arrest in Houston, Texas ins December 2015.  (Tr. 26-27, 29).  According to Agent Heirlein, the fingerprints from both files were compared and matched.  (Tr. 26-27, 29).  The next month, in April 2016, Defendant Abiola Balogun was indicted by a grand jury in the Northern District of Georgia.

Absent bare speculation, Defendant adduces absolutely no evidence suggesting deliberate delay.  Foxman, 87 F.3d at 1223 n.2 (interpreting references to "bad faith" delay in criminal prosecutions to mean situations where "the government acted to delay an indictment, hoping that the delay . . . would prejudice the defense").  Based on the evidence before the Court, the undersigned cannot find that the Government engaged in deliberate delaying tactics. Because the evidence does not support a finding that the Government deliberately delayed the indictment, this Court finds Defendant failed to meet her burden to establish either prong of the pre-indictment delay analysis, the Court finds that Defendant's due process rights were not violated due to pre-indictment delay. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Dismiss for Pre-Indictment Delay be **DENIED**.  (Docs. 14, 22, 43).

## MOTION TO DISMISS INDICTMENT

### I.    Background

Defendant Balogun also argues the indictment in this case should be dismissed because it fails to satisfy the indictment requirement of the Fifth Amendment. Defendant posits that the indictments fails to demonstrate that the grand jury found

materiality of false statements as an element for its probable cause determination that Defendant violated 18 U.S.C. § 1425(a).  (Doc. 51).  In support, Defendant points to a recent Supreme Court decision in <u>Maslenjak v. United States</u>, 137 S. Ct. 1918 (June 22, 2017).  Alternatively, Defendant asks the Court to inspect, *in camera*, the transcript of the grand jury proceedings to determine whether the grand jury was informed it must find probable cause for the offense element that she made false statements that were material to her procurement of naturalization.  For the reasons provided below, this Court finds no justification for recommending the dismissal the indictment in this case or inspecting the transcript of the grand jury proceedings.

**II.**   <u>**Legal Analysis**</u>

    1.   <u>Standard on Motion to Dismiss</u>

"'In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment, and more specifically, the language used to charge the crimes.'"   <u>United States v. Honeycutt</u>, No. 2:12-CR-00022-RWS, 2014 WL 2003029, at *4 (N.D. Ga. May 14, 2014) (emphasis omitted) (quoting <u>United States v. Sharpe</u>, 438 F.3d 1257, 1263 (11th Cir. 2006)); <u>see also</u> <u>United States v. Kopp</u>, No. 1:12-CR-0269-RWS, 2014 WL 2154199, at *4 (N.D. Ga. May 21, 2014) ("It is well-settled that a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial."), <u>aff'd</u>, 778 F.3d 986 (11th Cir. 2015).  "'Generally, an indictment is sufficient if it: 1) sets forth the elements of the offense in a manner which fairly informs the defendant of the charge against

AO 72A
(Rev.8/82)

which [s]he must defend and 2) enables [her] to enter a plea which will bar future prosecution for the same offense.'"[4] United States v. Germany, 296 F. App'x 852, 862 (11th Cir. 2008) (quoting United States v. Poirier, 321 F.3d 1024, 1028 (11th Cir. 2003)).   The Eleventh Circuit has held that "'when analyzing challenges to the sufficiency of an indictment, courts give the indictment a common sense construction, and its validity is to be determined by practical, not technical, considerations.'" Id. (quoting Poirier, 321 F.3d at 1029).

Furthermore, "[i]f an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the charge." United States v. Fern, 155 F.3d 1318, 1325 (11th Cir. 1998). "Similarly, if the facts alleged in the indictment warrant an inference that the jury found probable cause to support all the necessary elements of the charge, the indictment is not fatally deficient on Fifth Amendment grounds." Id.

2.    The Fifth Amendment

The Fifth Amendment requires the allegation of each element of an offense in a federal indictment. See Hamling v. United States, 418 U.S. 87, 117 (1974). "A criminal

---

[4] "[I]f the indictment tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which [s]he is charged." United States v. Slawson, No. 1:14-CR-00186-RWS-JFK, 2014 WL 5804191, at *5 (N.D. Ga. Nov. 7, 2014), adopted by 2014 WL 6990307, at *1 (N.D. Ga. Dec. 10, 2014) (citations and internal marks omitted). And, when "judging the sufficiency of an indictment, courts are cautioned to use a broad and enlightened standpoint of common sense and right reason rather than [a] narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding." Id.

conviction will not be upheld if the indictment upon which it is based does not set forth the essential elements of the offense." United States v. Gayle, 967 F.2d 483, 485 (11th Cir. 1992) (en banc), cert. denied, 507 U.S. 967 (1993). This rule serves two functions. First, it puts the defendant on notice of "the nature and cause of the accusation as required by the Sixth Amendment of the Constitution.   Second, it fulfills the Fifth Amendment's indictment requirement, ensuring that a grand jury only return an indictment when it finds probable cause to support all the necessary elements of the crime." Gayle, 967 F.2d at 485.  The law does not, however, require that an indictment track the statutory language.  United States v. Stefan, 784 F.2d 1093, 1101 (11th Cir. 19866), cert. denied, 479 U.S. 855, and cert. denied, 479 U.S. 1009 (1986).  If an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the charge.  Stefan, 784 F.2d at 1101-02.

3.   The Indictment

In this case, the Defendant was indicted by the grand jury in the Northern District of Georgia on April 12, 2016.  (Doc. 1).  Count One of the indictment charges Defendant with the following:

> On or about August 23, 2006, in the Northern District of Georgia, the defendant, ABIOLA TOPE BALOGUN, also known as Sarah Balogun and Abiola Sognnonvi, did knowingly procure, contrary to law, naturalization by the United States and United States citizenship, in violation of Title 18, United States Code, Section 1425(a).

(Doc. 1).  18 U.S.C. § 1425(a) provides, "Whoever knowingly procures or attempts to

21

procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship . . ." is guilty of an offense against the United States.  18 U.S.C. § 1425(a).

Defendant posits that even though 18 U.S.C. § 1425(a) does not expressly state a materiality requirement on its face, the Supreme Court's recent decision in Maslenjak v. United States, 137 S. Ct. 1918 (2017), requires dismissal of the indictment. Specifically, Defendant contends that in Maslenjak, the Supreme Court held that there is a materiality element for a § 1425(a) offense.  This Court notes that in Maslenjak, the Government charged Maslenjak with knowingly "procur[ing], contrary to law, [her] naturalization," in violation of 18 U.S.C. § 1425(a).  According to the government's theory, Maslenjak violated Section 1425(a) because, in the course of procuring her naturalization, she broke another law, 18 U.S.C. § 1015(a), which prohibits knowingly making a false statement under oath in a naturalization proceeding.  The false statements the government invoked were Maslenjak's answers to questions 23 and 24 on the citizenship application (stating that she had not lied in seeking refugee status) and her corresponding statements in the citizenship interview.   Those statements, the Government argued to the District Court, need not have affected the naturalization decision to support a conviction under Section 1425(a). The District Court agreed, over Maslenjak's objection, and  instructed the jury that a conviction was proper so long as the Government "prove[d] that one of the defendant's statements was false"- even if the statement was not "material" and "did not influence the decision to approve [her]

22

naturalization." App. to Pet. for Cert. 86a. The jury returned a guilty verdict; and the District Court, based on that finding, stripped Maslenjak of her citizenship.  See 8 U.S.C. § 1451(e).

The United States Court of Appeals for the Sixth Circuit affirmed the conviction thereby upholding the district court's instructions that Maslenjak's false statements need not have influenced the naturalization decision.  United States v. Maslenjak, 821 F.3d 675 (6th Cir. 2016).  The Sixth Circuit reasoned that if Maslenjak made false statements violating Section 1015(a) when she procured naturalization, then she also violated Section 1425(a) - irrespective of whether the false statements played any role in her obtaining citizenship.  See 821 F.3d at 685-86.  Thus, the Sixth Circuit held the government need not prove materiality when relying on a false statement.  Id. at 687-88. The Supreme Court granted certiorari to address whether an immaterial false statement made during a naturalization proceeding could support a Section 1425(a) conviction.

In vacating the Sixth Circuit's judgment, the Supreme Court held that the false statement must bear some causal connection to naturalization.  Otherwise put, there must be a causal nexus between the false statement and the grant of naturalization.  Where "the facts the defendant misrepresented are themselves disqualifying, . . . [t]he Government need only expose that lie to establish that she obtained naturalization illegally-or had she told the truth instead, the official would have promptly denied her application."  137 S. Ct. at 1928.  Alternatively, where "the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have

23

prompted reasonable officials . . . to undertake further investigation, . . . the Government need only establish that the investigation 'would predictably have disclosed' some legal disqualification." Id. at 1929 (quoting Kungys v. United States, 485 U.S. 759, 774 (1988). If such criteria are met, the defendant's misrepresentation contributed to the citizenship award in the way § 1425(a) requires. 137 S. Ct. at 1929. The Supreme Court also cautioned, "qualification for citizenship is a complete defense to a prosecution brought under § 1425(a)" - just as it is in a civil denaturalization proceeding. Id. at 1930. This is so "even though she concealed or misrepresented facts that suggested" she was not qualified. Id. "Section 1425(a)," the Court explained, "is not a tool for denaturalizing people who, the available evidence indicates, were actually qualified for the citizenship they obtained." Id.

Despite Defendant's argument to the contrary, nothing in the Maslenjak decision indicates that an indictment charging a violation of Section 1425(a) should be dismissed because the indictment does not mention an element of "materiality," or because "there is no indication in this case that the grand jury . . . found materiality of false statements as an element for its probable cause determination," or because it "does not contain factual allegations from which it can reasonably be inferred that the grand jury found that any false statements forming the basis for this prosecution. (Doc. 51 at 4). Instead of adding a new element to the offense, the Supreme Court in Maslenjak appears to have provided guidance as to what evidence is required to be presented to and evaluated by a jury. In Maslenjak, the Supreme Court held that when the underlying illegality alleged

24

in a § 1425(a) prosecution is a false statement to government officials, "[t]o decide whether a defendant acquired citizenship by means of a lie, a jury must evaluate how knowledge of the real facts would have affected a reasonable government official properly applying naturalization law.  If the facts the defendant misrepresented are themselves disqualifying, the jury can make quick work of that inquiry."  137 S. Ct. at 1928.  The Supreme Court therefore concluded that the trial court's jury instructions - that it could convict based on any false statement in the naturalization process, no matter how inconsequential to the ultimate decision - instructions were in error.  137 S. Ct. at 1930.  Moreover, Defendant has not cited nor is this Court aware of any case in which an indictment has been dismissed because it did not include a reference to a materiality requirement.  As noted above, the *jury* needed to find more than an unlawful false statement for a conviction under § 1425(a).

Finally, in light of the Supreme Court's decision in Maslenjak, to convict Defendant under 18 U.S.C. § 1425(a), the Government still must prove that (1) she knowingly procured citizenship and (2) that the naturalization and citizenship were procured contrary to law.  18 U.S.C. § 1425(a).   Based on this language, the Government must show that the false statement bears some causal connection to naturalization.  Because the indictment here tracks the language in § 1425(a) and adequately sets forth the essential elements of the offense charged, it satisfies the requirements of the Fifth Amendment.  See United States v. Wayerski, 624 F.3d 1342, 1350 (11th Cir. 2010) (finding an indictment "plainly sufficient" under the Fifth and

AO 72A
(Rev.8/82)

Sixth Amendments, including because it "specifically referred to and tracked the language of the statute on which it was based"); <u>United States v. Sanyaolu</u>, No. 1:16-CR-126, Doc. 105, at 4 (N.D. Ga. July 7, 2017).  Thus, under the facts of this case, <u>Maslenjak</u> does not require a dismissal of this action on Fifth Amendment grounds.[5]

.

## CONCLUSION

Based on the foregoing, the undersigned **RECOMMENDS** that Defendant's Motions to Dismiss the Indictment for Pre-Indictment Delay and Motion to Dismiss the Indictment on Fifth Amendment grounds be **DENIED**.  (Docs. 15, 23, 43, 51). As there are no further motions or problems pending before the undersigned Magistrate Judge, this action is hereby **CERTIFIED READY FOR TRIAL**.

**SO ORDERED AND REPORTED AND RECOMMENDED**, this <u>29th</u> day of December, 2017.

/s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

---

[5] In light of discussion above and because the indictment appears to be valid, this Court declines to inspect, *in camera*, the transcript of the grand jury proceedings to determine whether the grand jury was informed it must find probable cause for the offense element that Defendant made false statements that were material to her procurement of naturalization.

26